IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| DIGACOMM, LLC, | ) |
| | ) |
| Plaintiff, | ) |
| | ) 08 C 338 |
| v. | ) |
| | ) Judge George W. Lindberg |
| VEHICLE SAFETY AND COMPLIANCE, | ) |
| LLC, PITTCO CAPITAL PARTNERS, LP, | ) |
| PITTCO CAPITAL PARTNERS II, LP, | ) |
| J.R. "PITT" HYDE, III, and | ) |
| ANDREW SEAMONS, | ) |
| | ) |
| Defendants. | ) |

**MEMORANDUM OPINION AND ORDER**

Plaintiff DigaComm, LLC ("DigaComm") brought this action against Defendants in the Circuit Court of Cook County. Defendants removed the case, based on diversity jurisdiction. Before the Court are Defendants' motion for summary judgment as to all claims, and Plaintiff's motion for partial summary judgment. For the reasons stated below, Defendants' motion for summary judgment is granted, and Plaintiff's motion for partial summary judgment is denied.

**I. Factual Background**

Unless otherwise noted, the following facts are undisputed. Defendant Vehicle Safety and Compliance, LLC ("VSAC") is the sole member of Vehicle IP, LLC ("VIP"), a patent licensing and enforcement company that is not a party to this action. Defendants Pittco Capital Partners, LP and Pittco Capital Partners, II, LP (collectively "Pittco Defendants") hold approximately 36% of the preferred interests in Defendant VSAC. Defendant J.R. Hyde is a partner of the Pittco Defendants. Defendant Andrew Seamons is a limited partner of the Pittco Defendants, and is Chairman of the Board of VIP and VSAC.

On February 7, 2007, DigaComm hosted a meeting attended by VIP Board of Directors member Bradley Larschan; VIP and VSAC's general counsel and vice president, Raymond Bilbao; DigaComm principal Jonathan Tunick; DigaComm managing member Peter Smith; and John Hall, a representative of General Electric Co. ("GE"). At this meeting, DigaComm introduced GE to VIP, and GE became interested in acquiring VIP's patents.

In early March 2007, DigaComm and VIP agreed that DigaComm would receive 5% of the "waterfall splits" from a deal between GE and VIP. However, according to DigaComm, VIP and VSAC's general counsel subsequently informed DigaComm that the agreement to pay 5% to DigaComm was no longer acceptable.

Between March 26, 2007 and March 30, 2007, DigaComm and VIP conducted further negotiations. On March 30, 2007, Bilbao sent an e-mail to Tunick that stated: "We have spoken to Andrew [Seamons]. He is okay in principle with the fees and has given VIP approval to execute the letter agreement." A Letter Agreement between DigaComm and VIP was executed on March 30, 2007.

The March 30, 2007 Letter Agreement acknowledged that DigaComm was providing assistance to VIP in negotiating an asset purchase agreement, under which GE was to acquire certain of VIP's patents. The Letter Agreement provided that if the transaction between GE and VIP was consummated, DigaComm would receive a portion of proceeds recovered from enforcement of the assigned patents (the "cash waterfall proceeds"), according to a sliding scale.

In addition, the March 30, 2007 Letter Agreement contained the following provisions:

> DigaComm acknowledges that the distribution of any portion of the proposed Cash Waterfall Proceeds to DigaComm is subject to the approval of a majority of the VSAC Preferred Holders, and that such approval has not yet been

2

> obtained. Accordingly, this letter is executed by VIP subject to such approval of the majority of the VSAC Preferred Holders.
>
> VIP's management agrees to recommend to VSAC Preferred Holders that it is in the best interests of such VSAC Preferred Holders to approve the distribution of Cash Waterfall Proceeds to DigaComm as described herein as soon as practicable.

According to DigaComm, Bilbao informed it that the approval provision was required by VIP's and VSAC's operating agreements because the proposed agreement was a "Significant Transaction," as defined by the operating agreements. The Letter Agreement also contained an integration clause.

On July 17, 2007, a meeting of VSAC's board of directors and preferred interest holders was held. According to Defendants, at the meeting, Larschan recommended to the preferred interest holders that it was in their best interests to approve a distribution of cash waterfall proceeds to DigaComm, as set forth in the Letter Agreement. Bilbao told the preferred interest holders at the meeting that DigaComm had not earned its fee on the merits, but that they should nevertheless approve the fee because DigaComm had threatened to kill the GE deal if they did not do so. Defendants claim that the preferred interest holders decided to table the vote on the Letter Agreement until the VIP/GE negotiations progressed further; DigaComm contends that the preferred interest holders voted against DigaComm's fee at the July 17, 2007 meeting.

The VSAC board of directors and preferred interest holders met again on August 10, 2007. Defendants claim that the same preferred interest holders who attended the July 17 meeting also attended the August 10, 2007 meeting. Defendants claim that Larschan again recommended to the preferred interest holders that it was in their best interests to approve the Letter Agreement. According to Defendants, at the August 10 meeting, the preferred interest

holders voted unanimously against distributing cash waterfall proceeds to DigaComm.

The VSAC preferred interest holders approved the GE transaction on August 15, 2007, and the deal closed on August 16, 2007. On September 6, 2007, Larschan informed DigaComm that the VSAC preferred interest holders had rejected DigaComm's compensation.

DigaComm sued VSAC, the Pittco Defendants, Hyde, and Seamons here, alleging claims of fraud, tortious interference with contract, and unjust enrichment. Defendants have moved for summary judgment as to all counts in this action, and DigaComm has moved for partial summary judgment on the issue of whether VSAC's preferred interest holders were required to approve the March 30 Letter Agreement.

Meanwhile, pursuant to an arbitration provision in the Letter Agreement, DigaComm sued VIP and Larschan in a separate arbitration proceeding in Delaware for breach of contract, fraud, unjust enrichment, quantum meruit, and promissory estoppel. The arbitrator conducted a two-week hearing, during which the parties offered more than 350 exhibits. In addition, twenty witnesses testified, including Hyde and Seamons, who are defendants here, and other key players in the events at issue in this action, such as Tunick, Larschan, and Bilbao. On December 11, 2008, the arbitrator in the Delaware action issued a 43-page award, in which he found in favor of VIP as to DigaComm's common law fraud claim, and in favor of DigaComm as to the breach of contract (or equitable fraud) claim.

Defendants in this litigation contend that the arbitrator's decision bars all of DigaComm's claims here, under the doctrines of res judicata and collateral estoppel. The Court ordered supplemental briefing on the issue of the preclusive effect of the arbitrator's decision, and discusses that issue in the context of its examination of each of DigaComm's claims below.

## II. Analysis

Summary judgment shall be granted "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). The Court must draw all reasonable inferences in favor of the nonmoving party. Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 150 (2000). The moving party bears the initial burden of demonstrating that no material issue exists for trial. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). Once the moving party has properly supported its motion, the nonmoving party must offer specific facts demonstrating that a material dispute exists, and must present more than a scintilla of evidence to support its position. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 251-52 (1986). Where the parties file cross-motions for summary judgment, the Court "considers the merits of each cross-motion separately and draws all reasonable inferences and resolves all factual uncertainties against the party whose motion is under consideration." Murray v. HSBC Auto Fin., Inc., No. 05 C 4040, 2006 WL 2861954, at *2 (N.D. Ill. Sept. 27, 2006).

### A. Defendants' Motion for Summary Judgment

#### 1. Count I (Fraud)

In Count I, DigaComm claims that Defendants conspired with VIP and Larschan to defraud DigaComm out of compensation to which it was entitled, by making false statements, authorizing and/or approving VIP's and Larschan's misrepresentations, and falsely representing that VSAC's operating agreement required approval of DigaComm's compensation by the preferred interest holders. In addition, DigaComm claims that Defendants committed fraud through material omissions, by failing to advise DigaComm that they had no intention of

5

including it in the GE deal.

Defendants argue that DigaComm's fraud claim is barred by res judicata or collateral estoppel, because the arbitrator in the Delaware action found that VIP did not commit fraud. The doctrine of res judicata (claim preclusion) bars parties from relitigating claims that were or could have been raised in an earlier action, while collateral estoppel (issue preclusion) bars relitigation of issues decided in an earlier action. See Garcia v. Village of Mount Prospect, 360 F.3d 630, 634 n.6 (7th Cir. 2004).[1] An arbitration award can have the same res judicata and collateral estoppel effect as a court judgment. See IDS Life Ins. Co. v. Royal Alliance Assocs., Inc., 266 F.3d 645, 651 (7th Cir. 2001).

Res judicata applies if there is: (1) a final judgment on the merits in an earlier action, (2) an identity between the earlier and later actions, and (3) an identity of parties or their privies in the two actions. See Ross v. Bd. of Educ., 486 F.3d 279, 283 (7th Cir. 2007) (citing federal claim preclusion law); Garcia, 360 F.3d at 635 (citing Illinois law). A later cause of action is considered to be the same as the earlier action for res judicata purposes if it is the same transaction; that is, where "a single core of operative facts . . . give[s] rise to a remedy." Anderson v. Chrysler Corp., 99 F.3d 846, 852 (7th Cir. 1996). "Under this approach, 'two claims are one for the purposes of res judicata if they are based on the same, or nearly the same, factual allegations.'" Id. (quoting Herrmann v. Cencom Cable Assocs., 999 F.2d 223, 226 (7th Cir. 1993)).

---

[1] The parties cite Seventh Circuit and Illinois law on res judicata and collateral estoppel, and do not argue that the law of another jurisdiction should apply to this issue, or would dictate a different result.

The arbitrator described DigaComm's fraud claim in the arbitration proceeding as follows:

> [DigaComm] contends that VIP, through Larschan and Bilbao, was guilty of fraud in the inducement by inducing DigaComm to enter into the March 30 Letter Agreement with its condition for approval by the Preferred Interest holders. This because approval by the Preferred Interests was not required by VSAC's Operating Agreement as Tunick and Smith were led to believe by Bilbao and Larschan, and, secondly, because Seamons, by his own testimony, had not agreed to the tiered-fee schedule for DigaComm "in principle," nor had had [sic] he given his approval for Larschan and Bilbao to enter into the March 30 Letter Agreement on behalf of VIP, as Bilbao's March 30th e-mail to Tunick expressly stated that he had. But for its reliance on these misrepresentations, DigaComm says that it would not have agreed to a compensation agreement with the Preferred Interest approval provision in it.

In this litigation, DigaComm's fraud claim is more expansive than its claim in the arbitration, because its claim here encompasses actions (or inactions) that took place after it entered into the March 30 Letter Agreement. Thus, while part of DigaComm's fraud claim here is the same as its fraud claim in the arbitration proceeding, the Court cannot say that the claims are based on sufficiently similar facts to warrant the application of res judicata.

The Court comes to a different conclusion as to the application of collateral estoppel, however. Collateral estoppel applies if: (1) an issue in an earlier action is the same as the issue in the current proceeding, (2) there was a final judgment on the merits in the earlier action, and (3) the party against whom estoppel is asserted was a party or was in privity with a party in the earlier action. See Goodwin v. Bd. of Trustees of Univ. of Ill., 442 F.3d 611, 621 (7th Cir. 2006) (applying Illinois law); see also Havoco of Am., Ltd. v. Freeman, Atkins & Coleman, Ltd., 58 F.3d 303, 307 (7th Cir. 1995) (elements of issue preclusion under federal law are: (1) identity of issues, (2) the issue was actually litigated in the prior action, (3) the determination of the issue

7

was essential to the final judgment, and (4) the party against whom estoppel is invoked was fully represented in the prior action).

Here, the portion of DigaComm's fraud claim relating to DigaComm's entry into the Letter Agreement is identical to DigaComm's fraud in the inducement claim in the arbitration proceeding. In addition, the arbitrator decided the issue against DigaComm on the merits. Finally, DigaComm – the party against whom estoppel is asserted – was a party in the arbitration. The Court concludes that collateral estoppel bars the relitigation here of issues relating to DigaComm's contention that Defendants fraudulently induced it to enter into the March 30 Letter Agreement.

Even if collateral estoppel did not preclude a portion of DigaComm's fraud claim here, however, the Court would nevertheless grant Defendants' motion for summary judgment as to that claim because DigaComm cannot show that it justifiably relied on the representations regarding approval by the preferred interest holders. Under Illinois law,[2] a conspiracy is "a combination of two or more persons to accomplish by concerted action an unlawful purpose or a lawful purpose by unlawful means." Damato v. Merrill Lynch, Pierce, Fenner & Smith, Inc., 878 F. Supp. 1156, 1162 (N.D. Ill. 1995) (quoting Bosak v. McDonough, 549 N.E.2d 643, 646 (Ill. App. Ct. 1989)). To establish fraud under Illinois law, DigaComm must show: (1) a false statement of material fact or failure to disclose a material fact, (2) knowledge or belief of the falsity by the party making it, (3) an intention to induce DigaComm to act, (4) action by DigaComm in reliance on the statement or omission, and (5) damage to DigaComm resulting

---

[2] Since none of the parties has raised a conflict of law issue, and the parties cite Illinois law in their briefs, the Court will apply Illinois law in this diversity case. See Wood v. MidValley, Inc., 942 F.2d 425, 426 (7th Cir. 1991).

8

from such reliance.  See id.; Fox v. Heimann, 872 N.E.2d 126, 138 (Ill. App. Ct. 2007).  Reliance upon the misrepresentation or omission must have been justified.  See Cozzi Iron & Metal, Inc. v. U.S. Office Equip., Inc., 250 F.3d 570, 574 (7th Cir. 2001).  Fraud ultimately must be proven by clear and convincing evidence.  Assoc. Benefit Servs., Inc. v. Caremark RX, Inc., 493 F.3d 841, 853 (7th Cir. 2007).

According to DigaComm's response to Defendants' summary judgment motion, Defendants made the following false statements of material fact before the March 30, 2007 Letter Agreement was executed:

- Bilbao stated that VIP's and VSAC's operating agreements required majority approval of the GE deal and DigaComm's fees by the preferred interest holders;

- Bilbao stated that Seamons (a limited partner of Pittco, and Chairman of the Board of VIP and VSAC) was "okay in principle with [DigaComm's] fees," and had given approval for VIP to execute the Letter Agreement;

- Larschan and Bilbao told DigaComm that the VSAC preferred interest holders typically follow Seamons' lead; and

- Larschan and Bilbao stated that they would recommend approval of DigaComm's fee.[3]

According to DigaComm, contrary to the above statements, Defendants and VIP had no intention of including DigaComm in the GE deal.

DigaComm's fraud claim here is similar to the fraud claim in Runnemede Owners, Inc. v. Crest Mortgage Corp., 861 F.2d 1053 (7th Cir. 1988).  In that case, the plaintiff and defendant executed a commitment letter, under which the defendant agreed to extend a loan to the plaintiff

---

[3] DigaComm also contends that Larschan and Bilbao falsely stated that the approval process was a mere formality.  However, in support of this contention, DigaComm only offers DigaComm principal Tunick's testimony that it was his understanding that the process was a mere formality.

9

subject to a number of conditions, including approval by the defendant's Loan Committee. Id. at 1054-55. Before executing the commitment letter, plaintiff asked defendant's chairman about the makeup of the Loan Committee. Id. at 1055. Defendant's chairman responded: "Don't worry about the committee, I am the committee. What I say, goes. We have a deal." Id. When the defendant subsequently declined to extend the loan, the plaintiff sued, claiming that defendant's chairman made his representations despite his intention to deny the loan, for the purpose of obtaining the use of plaintiff's commitment fee for a period of time. Id. at 1058. The Seventh Circuit, applying Illinois law, affirmed the dismissal of the fraud claim on the basis that the plaintiff could not have justifiably relied on the chairman's assurances, given the language to the contrary in the written agreement. Id. at 1059.

Here, DigaComm claims that it believed the preferred interest holders' approval was a mere formality, based on Bilbao's representation that Seamons (who potentially controlled 36% of VSAC's preferred interests) had approved DigaComm's fees, that the other preferred interest holders typically followed Seamons' lead, and that Larschan and Bilbao would recommend approval to the preferred interest holders. This belief was unjustified, given the clear language of the Agreement, which stated that the agreement was conditioned on approval by a majority of the preferred interest holders, and that such approval had not yet been obtained. The conditional nature of the March 30 agreement was highlighted by VIP's March 29, 2007 rejection of proposed language in a draft of the Letter Agreement that stated: "While the foregoing is subject to VIP obtaining the approval of a majority of Preferred Holders, VIP management has recommended approval . . ." DigaComm, a business that received legal advice relating to the Letter Agreement, has offered no evidence that it was an unsophisticated participant in the

negotiations. DigaComm has not shown that it justifiably relied on the representations it claims were fraudulent.[4]

DigaComm's contention that Defendants fraudulently concealed material facts, by failing to disclose that they intended to cut DigaComm out of the GE deal, also fails. Mere silence does not give rise to a fraud claim. See Lagen v. Balcor Co., 653 N.E.2d 968, 973 (Ill. App. Ct. 1995). To prevail on a fraud claim based on an omission, a plaintiff must establish that the defendant "concealed a material fact with an intent to deceive when it was under a duty to disclose that fact to the plaintiff." Miner v. Fashion Enters, Inc., 794 N.E.2d 902, 917 (Ill. App. Ct. 2003). A duty to disclose arises when: (1) "the defendant's acts contribute to the plaintiff's misapprehension of a material fact," and the defendant deliberately fails to correct the misapprehension, or (2) a fiduciary duty exists. Am. Hardware Mfrs. Ass'n v. Reed Elsevier Inc., No. 03 C 9421, 2007 WL 495305, at *9 (N.D. Ill. Feb. 13, 2007). There is no dispute that Defendants did not owe DigaComm any fiduciary duty. Therefore, Defendants had a duty to speak only if they took some action to mislead DigaComm.

DigaComm argues, in conclusory fashion, that "Defendants' collective silence regarding the falsity of their prior representations constitutes 'active concealment.'" The only circumstances DigaComm identifies in its statement of additional facts that appear to relate to this issue are DigaComm's attendance at meetings with VSAC and GE, where no one raised any

---

[4] The arbitrator in the Delaware action observed that the respondents there could not rely on the integration clause in the March 30 Letter Agreement to show that DigaComm had not justifiably relied on previous representations. This Court notes that its conclusion in this ruling that DigaComm did not show justifiable reliance is based not on the integration clause, but rather on the clear language in the Letter Agreement that DigaComm's compensation was subject to approval by the preferred interest holders.

objection to DigaComm's efforts or role in the transaction, and Larschan's failure to express any objection to GE's inclusion of the Letter Agreement in the GE deal documents.[5]

The Court finds that this evidence does not show that Defendants acted to mislead DigaComm, and therefore concludes that DigaComm has not established a claim of fraud by material omission. Defendants' motion for summary judgment is granted as to Count I.

### 2. Counts II and III (Tortious Interference)

In Count II, DigaComm claims that Defendants tortiously interfered with a March 9, 2007 agreement between DigaComm and VIP; in Count III, DigaComm claims that Defendants tortiously interfered with the March 30, 2007 Letter Agreement. To prevail on these claims, DigaComm must establish that: (1) the March 9 and March 30, 2007 agreements were valid and enforceable contracts; (2) Defendants were aware of the contracts; (3) they intentionally and unjustifiably induced VIP to breach the contracts; and (4) DigaComm was damaged as a result. See HPI Health Care Servs., Inc. v. Mt. Vernon Hosp., Inc., 545 N.E.2d 672, 675 (Ill. 1989).

Defendants argue that DigaComm's tortious interference claim relating to the March 9 agreement is barred because the arbitrator found that the March 9 agreement was not a valid and enforceable contract. This argument is misplaced. While the arbitrator observed that he was not persuaded that the dealings and communications cited by DigaComm were sufficient to establish a contract, he determined that it was unnecessary to make a finding on the validity of the March 9 agreement because the March 30 Letter Agreement, through its integration clause, replaced any agreement that preceded it. Therefore, collateral estoppel does not apply to preclude Count II

---

[5] According to Defendants, although Larschan did not object to the inclusion of the Letter Agreement in the GE deal documents, he did advise GE that the preferred interest holders had not yet approved the Letter Agreement.

here, and the Court evaluates it on the merits.

Defendants argue that the March 9, 2007 agreement was not an enforceable contract because it lacks definite terms. In order to be an enforceable contract, an agreement must be "sufficiently definite and certain so that the terms are either determined or may be implied." Valenti v. Qualex, Inc., 970 F.2d 363, 366 (7th Cir. 1992). An agreement is not sufficiently definite to be enforceable unless "the court is enabled from the terms and provisions thereof, . . . to ascertain what the parties have agreed to do." Bus. Sys. Eng'g, Inc. v. Int'l Bus. Machines Corp., 547 F.3d 882, 888 (7th Cir. 2008) (quoting Academy Chicago Publishers v. Cheever, 578 N.E.2d 981, 983 (Ill. 1991)).

DigaComm states that the March 9 agreement is contained in a series of e-mail exchanges between Larschan at VIP, and Tunick at DigaComm on March 7 and March 9, 2007. On March 7, 2007, Larschan sent an e-mail to Tunick regarding the GE/VIP transaction, which stated in pertinent part:

> Although I have not had a chance to speak with the investors (as I mentioned, the first available time to talk is this Friday afternoon), I would feel comfortable recommending this deal to them, given the amount of funds GE is willing to invest (circa $25 million). This appears to be sufficient capital to aggressively litigate the OTAP, INS and Telecom patents in the US. A 55%-45% split would appear appropriate, with the understanding that the 55% would become 50% with 5% going to you and Peter.
>
> Does this seem about right to you?

Tunick responded to Larschan in a March 9, 2007 e-mail, which stated:

> I will report to you on John Hall's conversation with Todd Dickenson, but before doing so I want to ensure that we have agreement on our own working arrangement. As you and I agreed prior to our meeting, the waterfall splits will be 50% GE, 45% VIP and 5% DigaComm. Please fire me back an email confirming our prior understanding.

Larschan replied: "This represents our understanding of the percentage split."

The Court agrees with Defendants that these e-mails do not lay out the material terms of the agreement sufficiently to amount to an enforceable contract. For example, although the e-mails outline DigaComm's compensation, none of the e-mails mentions what DigaComm was expected to do under the agreement. See Bus. Sys. Eng'g, Inc., 547 F.3d at 890 (affirming grant of summary judgment on breach of contract claim in favor of defendant, where documents upon which plaintiff relied to establish contract failed to answer the question: "$3.6 million for what?"). Since DigaComm and VIP did not have an enforceable contract on March 9, 2007, DigaComm's claim of tortious interference relating to that agreement fails. Defendants' motion for summary judgment is granted as to Count II.

The Court next turns to DigaComm's tortious interference claim relating to the March 30, 2007 Letter Agreement. In its response to Defendants' summary judgment motion, DigaComm contends that the VSAC preferred interest holders blocked VIP from performing under the Letter Agreement by improperly "injecting themselves into VIP's decision-making," in violation of the provision of VSAC's own internal operating agreement that barred the preferred interest holders from voting on transactions that were not "Significant Transactions."

Defendants argue that collateral estoppel bars this tortious interference claim. The arbitrator found that the Letter Agreement's condition of approval by the preferred interest holders was excused due to VIP's breach of its contractual obligation to recommend a vote in favor of compensating DigaComm. Defendants argue that because the approval condition was excused, the vote of the VSAC preferred interest holders (the Defendants here) against DigaComm's compensation was meaningless and therefore inactionable.

14

DigaComm responds to this argument merely by stating, in conclusory fashion, that the argument "ignores a significant portion of DigaComm's case" because "Defendants could have and did interfere with the March 30 Letter Agreement in more ways than simply voting against it." DigaComm does not identify such other forms of interference, however, either in its brief regarding the collateral estoppel effect of the arbitrator's award, or in its response to Defendants' argument on summary judgment. The Court concludes that the arbitrator's decision that the approval condition was excused precludes DigaComm's tortious interference claim based on Defendants' vote pursuant to that condition.

Even if collateral estoppel did not apply, Defendants are entitled to summary judgment as to Count III because DigaComm has not shown tortious interference with the March 30 Letter Agreement. The very action DigaComm contends constituted tortious interference with that agreement -- Defendants' vote against DigaComm's compensation – was specifically included in, and authorized by, the agreement. Whether or not that provision was legitimately included in the Letter Agreement, and whether the interest holders' vote violated a different agreement to which DigaComm is not a beneficiary, are different issues from whether Defendants induced a breach of the Letter Agreement. Defendants' motion for summary judgment as to Count III is granted.[6]

### 3. Count IV (Unjust Enrichment)

In Count IV, DigaComm claims that Defendants were unjustly enriched by DigaComm's efforts in facilitating the GE deal. To prevail on a claim of unjust enrichment, a plaintiff must show that the defendant unjustly retained a benefit to the plaintiff's detriment, and that the

---

[6] Given this conclusion, the Court need not address the parties' arguments regarding the type of relief DigaComm could obtain here following the arbitrator's grant of specific performance of the March 30 Letter Agreement.

defendant's retention of the benefit violates the fundamental principles of justice, equity, and good conscience. See HPI Health Care Servs., Inc., 545 N.E.2d at 679. Where a plaintiff's theory of unjust enrichment is based on the same allegations of fraudulent dealings that support a fraud claim, resolution of the fraud claim against the plaintiff is also dispositive of the unjust enrichment claim. Ass'n Benefit Servs., Inc., 493 F.3d at 855. In addition, because unjust enrichment is an equitable remedy, it is only available when there is no adequate remedy at law. Season Comfort Corp. v. Ben A. Borenstein Co., 655 N.E.2d 1065, 1071 (Ill. App. Ct. 1995). Thus, when a contract governs the relationship between the parties, and the unjust enrichment claim is based in contract, unjust enrichment does not apply. Hartigan v. E & E Hauling, Inc., 607 N.E.2d 165, 177 (Ill. 1992).

The Court finds that DigaComm has not established a claim for unjust enrichment. To the extent that DigaComm bases this claim on fraud, it fails because its fraud claim fails. Nor can DigaComm succeed if its claim is based in contract. If VIP and Defendant VSAC are alter egos, DigaComm cannot maintain an unjust enrichment claim against VSAC, because the relationship between DigaComm and VSAC is governed by the contract between DigaComm and VIP. If VSAC and VIP are not alter egos, DigaComm's unjust enrichment claim still fails because, while DigaComm's actions may have benefitted VIP, DigaComm has offered no evidence that VSAC and the other defendants in this case retained any benefit. Defendants' motion for summary judgment is granted as to Count IV.

### B. DigaComm's Motion for Partial Summary Judgment

DigaComm moves for summary judgment on the issue of whether VSAC's preferred interest holders were required to approve the March 30 Letter Agreement, as represented to

DigaComm by Defendants. Based on the Court's ruling on Defendants' motion for summary judgment, DigaComm's motion for partial summary judgment is denied as moot.

**ORDERED:** Defendants' motion for summary judgment [202] is granted. Plaintiff's motion for partial summary judgment regarding the need for VSAC preferred holder approval [200] is denied as moot. Judgment in favor of Defendants and against Plaintiff will be set forth on a separate document and entered in the civil docket. See Fed. R. Civ. P. 58.

ENTER:

_____
George W. Lindberg
Senior U.S. District Judge

DATED:　March 2, 2009